UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION



| | | |
|---|---|---|
| JONATHAN A. GOWEN, derivatively on behalf of WHOLE FOODS MARKET, INC., | § § § § | Civil Action No. |
| Plaintiff, | § § | **A16CV0392 RP** |
| v. | § § § | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| WALTER ROBB, JOHN B. ELSTROTT, JOHN MACKEY, GABRIELLE SULZBERGER, HASS HASSAN, STEPHANIE KUGELMAN, JONATHAN A. SEIFFER, MORRIS SIEGEL, JONATHAN D. SOKOLOFF, RALPH Z. SORENSON, GLENDA FLANAGAN, and WILLIAM A. TINDELL, III | § § § § § § § § § | DEMAND FOR JURY TRIAL |
| Defendants, | § § | |
| and | § § | |
| WHOLE FOODS MARKET, INC., | § § | |
| Nominal Defendant. | § § | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

1.     Plaintiff Jonathan A. Gowen ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Whole Foods Market, Inc. ("Whole Foods" or the "Company") against certain current and/or former members of its Board of Directors (the "Board"), its co-founder and co-Chief Executive Officer ("CEO") (John P. Mackey ("Mackey")), its other co-CEO (Walter E. Robb ("Robb")), its Chief Financial Officer ("CFO") (Glenda Jane Flanagan ("Flanagan")), its President and Chief Operating Officer ("COO") (A.C. Gallo ("Gallo")), and its Executive Vice Presidents of Operations

1

(David Lannon ("Lannon")), and Kenneth J. Meyer ("Meyer")), seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from at least August 2014 through the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      Whole Foods was founded in 1978 and is headquartered in Austin, Texas. According to the Company's public filings, Whole Foods operates as a retailer of natural and organic foods.  The Company's stores offer produce and floral, grocery, meat, seafood, bakery, prepared foods and catering, coffee, tea, beer, wine, cheese, nutritional supplements, vitamins, and body care products, as well as lifestyle products, including books, pet products, and household products.  As of February 2016, the Company had approximately 436 stores worldwide.  Its shares trade on the NASDAQ Global Select Market under the ticker symbol "WFM."

3.      Whole Foods is known for charging premium prices, and claims to leverage high quality standards to "attract and maintain a broad base of loyal customers."  In the Company's public filings, Defendants (defined herein) repeatedly highlighted the Company's "emphasis on perishable" food items and touted its prepared (including pre-packaged) food offerings as a "key differentiator" of Whole Foods in relation to competing grocery store chains.  Prepared food items accounted for more than nineteen percent of Whole Foods' sales in 2014, and approximately the same percent of sales in 2013 and 2012.

4.      On the Company's website, in its annual stakeholders' report, and in quarterly conference calls, the Defendants regularly promoted Whole Foods' commitment to values, transparency and building customers' trust through, among other things, competitive pricing, as the key differentiators between the Company and its competition.

2

For example, during Cannacord Genuity's Global Growth Conference on August 14, 2012, defendant Robb emphatically stated that:

> [W]e see ourselves as being in somewhat of a leadership role in the supermarket industry and the food industry. I think one of the ways we've been able to continue to create some separation from the competitors . . . has been to continue to set standards of transparency, accountability . . . .

5.      Similarly, as defendant Robb stated at the Goldman Sachs Global Retailing Conference on September 7, 2011:

> There's no question about it that by becoming relevant again on price, people have said, okay, I'm noticing that. I'm coming back. I'm trusting you. And that is driving and building loyalty and basket and traffic.

6.      Defendants focused their remarks on pricing because under their direction and on their watch, the Company's prices have historically been markedly higher than competitors' prices.   Indeed, for more than two decades, Whole Foods has been pejoratively called "Whole Paycheck" and, as a Wells Fargo Securities analyst put it in November 2013, "price is the most important reason people don't shop [at Whole Foods] or don't shop more often."  Moreover, as consumer demand for natural and organic foods has grown, more traditional retailers like Safeway, Kroger, and WalMart have increased their natural and organic food offerings, putting intense pressure on Whole Foods to compete on price.  Thus, to remain competitive in light of the new entrants to the natural and organic food retailing industry, the Defendants caused Whole Foods to increase its efforts to reduce prices in an attempt to shed its "Whole Paycheck" moniker, including expanding its effort to cut prices on perishable items.  That effort included the Defendants causing Whole Foods to invest a substantial amount of capital in technology to monitor, control and adjust the prices of its items from its corporate headquarters.

7.      Defendants consistently equated "value" with lower, competitive pricing.

For example, in the 2013 Annual Stakeholders' Report, Defendants caused the Company

to state:

> **WE ARE FOCUSED ON BOTH VALUE AND VALUES.**
>
> We continued to expand our value offerings across the store and narrowed the pricing gap versus our competitors on known value items to its narrowest margin yet.

8.     Similarly, in the June 13, 2012 conference call with analysts and investors,

defendant Mackey stated:

> [W]e are always working value now. We are very conscious of it. We price against our competitors. We know in every market what the prices our competitors have.

9.     In keeping with its focus on natural and organic foods, Whole Foods' sales

mix is heavily weighted towards perishable products, including prepared foods, meat,

seafood, cheeses and produce.  While perishables account for less than half the product

mix at most other grocery stores, perishables comprise two thirds of the Company's sales.

One analyst observed that Whole Foods' emphasis on perishables (which are not branded),

coupled with its relatively small offering of nationally-branded products, created a

customer base that "focused on Whole Foods as the brand behind a majority of the products

it sells."

10.     Defendant Mackey has publicly acknowledged the value of information

collected through the use of its technology investments to facilitate pricing initiatives and

remain competitive on pricing:

> [We have] developed our data team to the point now where we have such good information that we do a lot of experiments, which is really exciting. And so we can try a lot of different pricing initiatives against different types of competitors, again, in different marketplaces, with different products, and see what happens, see what kind of elasticity there is in terms of the pricing versus pickup in sales and see what customers really want.

11.     Not only was Whole Foods (under the Defendants' direction and on their watch) meticulously focused on its prices, its regulators were too. As a retail grocer, Whole Foods is/was required to comply with weights and measures regulations setting forth the procedures and standards for measuring, weighing and labeling its packaged goods. These general standards and procedures are set forth in the National Institute of Standards and Technology Handbook 133: Checking the Net Contents of Packaged Goods ("Handbook 133"), which has been adopted by New York, California, Texas and several other states. Handbook 133 sets out a seven-step method for determining whether the net content of packaged goods is unlawfully less than the amount stated on the label. It is not unlawful for a package to be overweight, *i.e.*, mislabeled in a way that benefits the consumer.

12.     With respect to its growth prospects in recent years, Whole Foods (under the Defendants' direction and on their watch) began accelerating its new store openings, opening a record 10 stores during 1Q13, and was reportedly on pace to open 32-34 new stores during the year and approximately 33-38 stores in FY14.[1] Indeed, in March 2013, defendant Robb confidently proclaimed the Company could "easily see the roadmap to 1,000 stores . . . without even breaking a sweat." At the same time, however, the Company was under pressure to increase its return on invested capital ("ROIC"), which analysts recognized was key to the Company's long-term growth target. As one analyst noted, "Strong ROIC = More Confidence in Achieving LT Store Growth Target," and while "[i]n the past, WFM might realize ROIC from new stores in the 7% range; today, the company

---

[1] In this Complaint, Whole Foods' fiscal quarters are abbreviated by quarter and year. For example, 3Q13 represents the third quarter of fiscal year 2013. Whole Foods' fiscal year ("FY") ends the last Sunday in September.

is seeing ~14%, and there's opportunity to move it even higher."

13.     With that background, the Defendants breached their fiduciary duties by, *inter alia*, disseminating false and misleading statements concerning the state of the Company's current business condition and future financial prospects. In particular, and in addition to financial results, which were materially misstated due to overcharging customers for prepackaged goods (as discussed herein), the Defendants asserted and repeatedly and falsely made assurances that Whole Foods' business was run with high standards and transparency including competitive product pricing that would drive traffic and revenue growth.

14.     In truth, however, Defendants' statements including those concerning the Company's quarterly and annual reported financial results, pricing accuracy and transparency and the adequacy of the Company's internal controls (which Defendants certified pursuant to §302 and §906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), SEC Rule 13a-14(a), and 18 U.S.C. §1350), were materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by Defendants: (a) the Company's reported financial results were driven in part by the Defendants' systemic and pervasive overpricing and mispricing of prepackaged foods caused by routine tare weight[2] errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region; (b) Whole Foods (under the Defendants' direction and on their watch)

---

[2] "Tare weight" is the weight of an empty container. By subtracting tare weight from gross weight, the weight of the goods carried may be determined.

routinely overcharged customers and engaged in known and preventable weights and measures violations on its prepackaged foods, which Defendants acknowledged could negatively (and materially) impact the Company's reputation and customers' trust – and consequently the Company's sales, revenue and margins (and stock price); (c) Whole Foods was the subject of ongoing investigations of substantial and repeated weights and measures violations, including its failure to deduct the weight of containers, which would later result in significant fines, a permanent injunction and forced changes to its business practices; and (d) Whole Foods' internal and disclosure controls (under the Defendants' direction and on their watch) were insufficient to prevent the Company from systemically overstating the weight of prepackaged foods and overcharging customers.

15.     In June 2014, the State of California, Whole Foods' largest market, levied an $800,000 fine on the Company for alleged violations of the California Business and Professions Code.  Specifically, California alleged, among other things, that Whole Foods violated California's prohibition on unfair and deceptive business practices by making untrue or misleading statements constituting false advertising, selling an item in less quantity than it was represented and selling a prepackaged commodity in less weight than represented.  The Defendants caused the Company to enter into a permanent injunction with the State of California, paid fines and agreed to implement a compliance program to resolve the claims.

16.     Notwithstanding the stern and swift actions of California, the Defendants incredibly continued or make and/or caused the Company to continue to make false and misleading statements concerning the adequacy of its internal controls, overall quality, value and business standards.

17.     The truth regarding Defendants' breaches more fully emerged on June 24, 2015 when the New York City Department of Consumer Affairs (the "DCA") announced it had uncovered "widespread problem[s]" of "[s]ystemic [o]vercharging for [p]re-[p]ackaged [f]oods" at Whole Foods' eight New York City locations:[3]

- DCA tested packages of 80 different types of prepackaged products and found all of the products had packages with mislabeled weights.

- 89 percent of the packages tested did not meet the federal standard for the maximum amount that an individual package can deviate from the actual weight . . . .

- DCA's findings point to a systematic problem with how products packaged for sale at Whole Foods are weighed and labeled.

- [T]his is the worst case of mislabeling they have seen in their careers . . . .

18.     On June 29, 2015, defendants Robb and Mackey posted a video to the Company's website to admit and "own" the pricing and mislabeling issues identified by the New York City DCA:

Hi. I'm Walter Robb, and together with John Mackey we serve as the co-CEO's of Whole Foods Market and we want to talk directly with you this morning about certain pricing issues you may have heard about in our New York City stores. Straight up, we made some mistakes. We want to own that and tell you what we're doing about it.

19.     On July 2, 2015, SunTrust Robinson Humphrey analysts issued a report titled "WFM Reacts to 'Thumb-on-Scale' Charges:"

Whole Foods Market, Inc. is in the news this morning . . . with a surprising apology for inaccurate pricing in its NYC stores. This follows recent charges by NYC's Department of Consumer Affairs that WFM was overcharging customers based on weight discrepancies.

After initially denying the claims, the defendants decided to "come clean," presumably after conducting an internal investigation. The incorrect

---

[3] A ninth Whole Foods location opened after DCA's investigation was conducted.

charges, according to the defendants, went "both ways" and only took place in a small portion of the assortment. Along with the apology, management promised to tighten procedures chain-wide and follow up with periodic (and published) audits.[4]

20.     Then, on July 29, 2015, after the market closed, the Defendants caused the Company to issue a press release announcing its financial and operating results for the third quarter ended July 5, 2015, which fell far short of analysts' revenue and earnings expectations, reporting adjusted 3Q15 EPS of $0.43 on $3.63 billion of revenue.   The Company also reported a shocking decline in comparable store sales growth admittedly due to disclosures of the Company's overpricing and mislabeling violations.[5]  During a conference call with analysts and investors to discuss the 3Q15 results, Defendants directly attributed Whole Foods' lower-than-expected quarterly financial results to the impact of the disclosure that the Company had systemically overcharged its customers, stating that the news had a "significant impact on our sales" and that the impact was "felt across the whole country:"

- Comps dropped sharply in week 11, after our New York City weights and measures audit received national media attention . . . .

---

[4] To date, it is not clear whether the Defendants have caused Whole Foods to publish any such pricing audits.

[5] Whole Foods, in its 2013 Form 10-K, defined and determined comparable store sales ("comps") in the following way:

> Sales of a store are deemed to be comparable commencing in the fifty-third full week after the store was opened. Stores acquired in purchase acquisitions enter the comparable store base effective the fifty-third full week following the date of merger. Identical store sales exclude sales from relocated and remodeled stores with square footage changes greater than 20% from the comparable calculation to reduce the impact of square footage changes on the comparison. Stores closed for eight or more days are excluded from the comparable and identical store base from the first fiscal week of closure until re-opened for a full fiscal week. Comparable and identical sales growth is calculated on a same-calendar-week to same-calendar-week basis.

- And clearly it affected the comps. . . . But by any measure, it had significant impact on our sales.

- The impact was really felt across the whole country, not in New York City.

21.     As a result of the disclosures of the Company's earnings shortfall, Whole Foods stock price declined $4.74 per share, or over 11%, to close at $36.08 per share on July 30, 2015.

22.     On July 30, 2015, SunTrust Robinson Humphrey published a reported titled, "WFM 3Q Comp Light; Reset Numbers; Buy" and explained that the disappointing financial results and the concomitant precipitous drop in Whole Foods' stock price was indeed caused by the widespread overcharging in New York:

> The market treated this [earnings] news rather harshly, sending the shares down 10%-11% in after market trading. We understand the frustration. A big portion of the shortfall evidently came from the pricing "scandal" in NYC in June . . . this factor alone seemed to cause comps to decelerate from 2.6% (the QTD run rate at that point) to 0.4% in the last two weeks of the period.

23.     Whole Foods' customer traffic, sales and revenue continued to lag after the July 29, 2015 earnings announcement, and have yet to recover from the pricing scandal and revelations that the Company (under the Defendants' direction and on their watch) routinely overcharged customers.

24.     On November 4, 2015, the Defendants caused the Company to announce its quarterly results for 4Q15, which spanned July 6, 2015 – just a week after the New York City DCA investigation was announced – through September 27, 2015, acknowledging the need to "[r]ebuild sales" and that comparable store sales on a constant currency basis had declined.  Defendant Robb stated that "[w]e recognize the need to move faster and go

deeper to rebuild traffic and sales and create a solid foundation for long-term profitable growth and are taking the necessary steps to better communicate our differentiation, improve our value perception, and fundamentally evolve our business."

25.     During a conference call later in the day on November 4, 2015, defendant Mackey outlined the Company's new nine-point plan to rebuild sales momentum and acknowledged "that we recognize we have our work cut out for us.  We believe we are taking the necessary steps to regain our sales momentum, fundamentally evolve our business model, and produce the returns that the investment community expects from us, and that we expect from ourselves."  On this disclosure, the price of Whole Foods common stock declined $1.16 per share between November 3, 2015 and November 5, 2015.

26.     Notably, the price of the Company's stock still has not recovered and currently trades for around $33 per share.  By way of comparison, Whole Foods stock traded as high as over $56 per share in February 2015.

27.     In light of the foregoing, on November 6, 2015, Plaintiff issued a demand pursuant to Texas law (the "Demand") on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company related to the allegations and events set forth herein.  A true and correct copy of the Demand is attached hereto at Exhibit A.

28.     The Demand was received by a Company agent on November 10, 2015.  A true and correct copy of the signed Certified Mail Receipt is attached hereto at Exhibit B.

29.     Pursuant to Tex. Business Organizations Code § 21.553:

DEMAND.  (a)  A shareholder may not institute a derivative proceeding until the 91st day after the date a written demand is filed with the corporation stating with particularity the act, omission, or other matter that is the subject of the claim or challenge and requesting that the corporation

take suitable action. (b) The waiting period required by Subsection (a) before a derivative proceeding may be instituted is not required if: (1) the shareholder has been previously notified that the demand has been rejected by the corporation; (2) the corporation is suffering irreparable injury; or (3) irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.

30.     Accordingly, pursuant to Texas law, Plaintiff waited ninety (90) days for a response. However, after ninety-one (91) days had elapsed, Plaintiff had still received no response to the Demand whatsoever. This in and of itself constituted a wrongful refusal.

31.     Nonetheless, on February 13, 2016, Plaintiff's counsel sent another letter to the Board (the "February 13th Letter"). The February 13th Letter included a copy of the Demand, and requested confirmation within five days of receipt that the Demand had been received by the Board and that the Board had not issued a response. A true and correct copy of the February 13, 2016 letter is attached hereto as Exhibit C.

32.     Plaintiff's counsel confirmed that the February 13th Letter was received by a Company agent.

33.     Then, on February 22, 2016, Plaintiff's counsel communicated via telephone with counsel authorized to speak on behalf of the Board. During the call, Plaintiff's counsel was informed that the Board had, in fact, received the Demand in November 2015, and had intentionally chosen not to investigate it or issue a response to it.

34.     Pursuant to Texas law, the Board was duty bound upon receipt to investigate the Demand. As such, the Board's admitted intentional failure to do so cannot be construed as anything but a wrongful refusal. This, coupled with the fact that Plaintiff received no response whatsoever by the ninety-first day, cannot lead to any conclusion other than that which is readily apparent – that the Demand has been wrongfully refused.

35.     Thus, given the Board's flagrant disregard of Texas law and intentional

failure to even investigate the Demand, Plaintiff has been left with no other recourse than filing this Action, which must be allowed to proceed.

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

37.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  The Company is incorporated and headquartered in this District, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

38.     Plaintiff is a current holder of Whole Foods common stock and has continuously held Whole Foods stock since August 2014.   Plaintiff is a citizen of Pennsylvania.

39.     Nominal defendant Whole Foods is a Texas corporation with its principal executive offices located at 550 Bowie Street, Austin, TX 78703.  According to its public filings, Whole Foods operates as a retailer of natural and organic foods.  The Company's stores offer produce and floral, grocery, meat, seafood, bakery, prepared foods and catering, coffee, tea, beer, wine, cheese, nutritional supplements, vitamins, and body care

products, as well as lifestyle products, including books, pet products, and household products. As of February 2016, the Company had approximately 436 stores worldwide. Its shares trade on the NASDAQ Global Select Market under the ticker symbol "WFM."

40.     Defendant Mackey serves as Whole Foods' co-CEO and a director of the Company. Mackey founded Whole Foods in 1978 and served as CEO of the Company from 1980 until 2010, at which time he was named co-CEO. Upon information and belief, defendant Mackey is a citizen of Texas.

41.     Defendant Robb has served as the Company's co-CEO, along with Mackey, since 2010. Throughout the Relevant Period, Robb also served as a director of the Company. Upon information and belief, defendant Robb is a citizen of Texas.

42.     Defendant Flanagan has served as Whole Foods' CFO and Executive Vice President since 1988. Upon information and belief, defendant Flanagan is a citizen of Texas.

43.     Defendant Gallo serves as Whole Foods' President and COO. Defendant Gallo has been President and COO since 2010 and held a variety of positions at Whole Foods prior to that. Upon information and belief, defendant Gallo is a citizen of Texas.

44.     Defendant Lannon has served as Executive Vice President of Operations for Whole Foods. Defendant Lannon has been Executive Vice President of Operations since 2012 and has held a variety of positions at Whole Foods prior to that. Upon information and belief, defendant Lannon is a citizen of Texas.

45.     Defendant Meyer serves as Executive Vice President of Operations for Whole Foods. Defendant Meyer has been Executive Vice President of Operations since 2012 and has held a variety of positions at Whole Foods prior to that. Upon information

and belief, defendant Meyer is a citizen of Texas.

46.     Defendant Dr. John B. Elstrott ("Elstrott") is Chairman of the Board and has served as a director of the Company since 1995. During the Relevant Period, defendant Elstrott served as a member of the Board's Audit Committee (the "Audit Committee"). Upon information and belief, defendant Elstrott is a citizen of Louisiana.

47.     Defendant Gabrielle Sulzberger ("Sulzberger") has served as a director of the Company since 2003. During the Relevant Period, defendant Sulzberger served as a member of the Audit Committee. Upon information and belief, defendant Sulzberger is a citizen of California.

48.     Defendant Hass Hassan ("Hassan") has served as a director of the Company since 2005. During the Relevant Period, defendant Hassan served as a member of the Audit Committee. Upon information and belief, defendant Hassan is a citizen of Colorado.

49.     Defendant Stephanie Kugelman ("Kugelman") has served as a director of the Company since December 2008. Upon information and belief, defendant Kugelman is a citizen of New York.

50.     Defendant Jonathan A. Seiffer ("Seiffer") has served as a director of the Company since 2008. During the Relevant Period, defendant Seiffer served as a member of the Audit Committee. Upon information and belief, defendant Seiffer is a citizen of California.

51.     Defendant Morris Siegel ("Siegel") has served as a director of the Company since 2003. During the Relevant Period, defendant Siegel served as a member of the Audit Committee. Upon information and belief, defendant Siegel is a citizen of Colorado.

52.     Defendant Jonathan D. Sokoloff ("Sokoloff") has served as a director of the

Company since 2008.  Upon information and belief, defendant Sokoloff is a citizen of California.

53.     Defendant Dr. Ralph Z. Sorenson ("Sorenson") has served as a director of the Company since 1994.  Upon information and belief, defendant Sorenson is a citizen of Colorado.

54.     Defendant William A. Tindell, III ("Tindell") has served as a director of the Company since December 2008.  Upon information and belief, defendant Tindell is a citizen of Texas.

55.     Collectively, defendants Mackey, Robb, Flanagan, Gallo, Lannon, Meyer, Elstrott, Sulzberger, Hassan, Kugelman, Seiffer, Siegel, Sokoloff, Sorenson and Tindell shall be referred to herein as "Defendants."

56.     Collectively, defendants Elstrott, Hassan, Seiffer, Siegel, and Sulzberger shall be referred to as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

57.     By reason of their positions as officers, directors, and/or fiduciaries of Whole Foods and because of their ability to control the business and corporate affairs of Whole Foods, Defendants owed Whole Foods and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Whole Foods in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Whole Foods and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Whole Foods and its shareholders the fiduciary duty to exercise good faith and diligence in the

16

administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

58.     Defendants, because of their positions of control and authority as directors and/or officers of Whole Foods, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Whole Foods, each of the Defendants had knowledge of material non-public information regarding the Company.

59.     To discharge their duties, the officers and directors of Whole Foods were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Whole Foods were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

60.     Pursuant to the Company's Audit Committee Charter (effective August 24,

2010), the Audit Committee Defendants are specifically charged with, *inter alia*:

    a.  Reviewing the audited financial statements and discussing them with management and the independent auditor. These discussions shall include consideration of the quality of the Company's accounting principles as applied in its financial reporting, including review of estimates, reserves and accruals, review of areas of judgment, review of audit adjustments whether or not recorded, difficulties encountered in performing the audit and such other inquiries as may be appropriate. Based on the review, the Committee shall make its recommendation to the Board of Directors as to the inclusion of the Company's audited financial statements in the Company's annual report on Form 10-K;

    b.  Reviewing with management and the independent auditor the quarterly financial information prior to the Company's announcement of quarterly results and filing of Form 10-Q and reviewing earnings press releases;

    c.  Reviewing and discussing the adequacy and effectiveness of the Company's internal control over financial reporting, including reviewing management's assessment of the effectiveness of internal control over financial reporting as of the end of the most recent fiscal year and the independent auditor's report on management's assessment, and reviewing and discussing the adequacy and effectiveness of the Company's disclosure controls and procedures;

    d.  Reviewing the Company's compliance systems with respect to legal and

regulatory requirements and reviewing the Company's code of conduct and programs to monitor compliance with such code. The Committee shall receive corporate attorneys' reports of evidence of a material violation of securities laws or breaches of fiduciary duty; and

e. Discussing the Company's policies with respect to risk assessment and risk management, including the risk of fraud. The Audit Committee shall also discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

## SUBSTANTIVE ALLEGATIONS

### A. <u>Background of the Company and its Business</u>

61.    Whole Foods was founded in 1978 and is headquartered in Austin, Texas. According to the Company's public filings, Whole Foods operates as a retailer of natural and organic foods. The Company's stores offer produce and floral, grocery, meat, seafood, bakery, prepared foods and catering, coffee, tea, beer, wine, cheese, nutritional supplements, vitamins, and body care products, as well as lifestyle products, including books, pet products, and household products. As of February 2016, the Company had approximately 436 stores worldwide. Its shares trade on the NASDAQ Global Select Market under the ticker symbol "WFM."

62.    Whole Foods is known for charging premium prices, and claims to leverage high quality standards to "attract and maintain a broad base of loyal customers." In the Company's public filings, Defendants repeatedly highlight the Company's "emphasis on perishable" food items and tout its prepared (including pre-packaged) food offerings as a "key differentiator" of Whole Foods in relation to competing grocery store chains.

Prepared food items accounted for more than nineteen percent of Whole Foods' sales in 2014, and approximately the same percent of sales in 2013 and 2012.

63.     Given that Whole Foods charges a premium for its products, it is of the utmost importance that the Company does not face any adverse publicity and that its reputation (which allows it to charge these premium prices) is protected.  For instance, in the Company's Annual Report filed with the U.S. Securities and Exchange Commission (the "SEC") on Form 10-K on November 21, 2014 (the "2014 10-K"), Defendants caused the Company to state, in pertinent part:

> *Adverse publicity may reduce our brand value and negatively impact our business.* We believe our Company has built an excellent reputation as a food retailer, socially responsible corporation and employer, and we believe our continued success depends on our ability to preserve, grow and leverage the value of our brand. Brand value is based in large part on perceptions of subjective qualities, and even isolated incidents can erode trust and confidence, particularly if they result in adverse publicity, governmental investigations or litigation, which can negatively impact these perceptions and our business. We believe that many customers choose to shop our stores because of their interest in health, nutrition and food safety and that they hold us to a higher food safety standard than other supermarkets. There is increasing governmental scrutiny of and public awareness regarding food safety. The real or perceived sale of contaminated food products by us could result in government enforcement action, private litigation, product recalls and other liabilities, the settlement or outcome of which might have a material adverse effect on our operating results and brand value.

64.     In addition to the Company's reputational concerns, in the 2014 Form 10-K, Defendants admitted that if the Company operates in an illegal manner, not only will its reputation be adversely effected, but also the Company's financial results "could be materially impacted..."  Specifically, the 2014 Form 10-K set forth:

> *Pending or future legal proceedings could materially impact our results of operations.* From time to time, we are party to legal proceedings, including matters involving personnel and employment issues, personal injury, product liability, protecting our intellectual property, acquisitions, and other proceedings arising in the ordinary course of business. Our results could be

materially impacted by the decisions and expenses related to pending or future proceedings.

65.     Further, in the 2014 Form 10-K, Defendants have admitted that they are "responsible for establishing and maintaining adequate internal control over financial reporting" and any failure to do so could expose the Company "to litigation or adversely affect the market price of our common stock." Specifically, the 2014 Form 10-K stated:

> *A failure of our internal control over financial reporting could materially impact our business or stock price.* The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting. An internal control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all internal control systems, internal control over financial reporting may not prevent or detect misstatements. Any failure to maintain an effective system of internal control over financial reporting could limit our ability to report our financial results accurately and timely or to detect and prevent fraud, and could expose us to litigation or adversely affect the market price of our common stock. The Company's management concluded that its internal control over financial reporting was effective as of September 28, 2014. See Part II, "Item 9A. Controls and Procedures – Management's Report on Internal Control over Financial Reporting," of this report.

66.     In light of Defendants' admitted need for the Company to avoid negative publicity (in addition to the potentially adverse effects any legal actions or inaccuracies in the Company's financial statements could have on Whole Foods), the Company has adopted numerous corporate policies aimed at ensuring that the Company is operated lawfully and portrayed positively and accurately. For instance, pursuant to the Company's Code of Business Conduct (revised September 10, 2013) (the "Code of Conduct"), which expressly applies to all Defendants, every member of the Company is obligated to "always deal fairly with [the Company's] customers, suppliers, vendors, competitors and

employees…" In particular, the Code of Conduct states:

**Fair Dealing**
Team Members and Board Members should always deal fairly with WFM's customers, suppliers, vendors, competitors and employees. They should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, falsification, misrepresentation of material facts or any other practice involving intentional unfair dealing. This provision does not alter existing legal relationships between the Company and its Team Members, including any at-will employment arrangements.

67.    Additionally, with regard to the Company's admitted need to ensure that the

Company's financial disclosures are accurate, the Code of Conduct states:

**Financial Integrity; Maintaining Books and Records**
Accurate records are essential to the successful operation of WFM. Team Members are responsible for preparing accurate and complete Company records, information and accounts. For example, claims on an expense report or time record, payments and other transactions must be correctly recorded and accounted for, and properly authorized in accordance with Company policies. All business records should be clear, truthful and accurate. Keep in mind that business records and communications may become subject to public disclosure through government investigations, litigation or the media. Business records are Company assets and must be retained or destroyed in accordance with applicable policy.

As a public company, WFM is required to file periodic reports and make certain public communications. Team Members must act to promote full, fair, accurate, timely and understandable disclosure and reporting of Company information, including the Company's financial results and financial condition, in reports and documents that the Company files with or submits to the Securities and Exchange Commission and other government agencies, and in the Company's other public communications. All Team Members must comply with Company policies, procedures and controls designed to promote accurate and complete recordkeeping. Accounting for, and financial reporting of, actual transactions and forecasts must follow the Company's accounting policies as well as all applicable generally accepted accounting principles and laws. If you have questions or concerns about the Company's accounting, auditing, financial reporting or internal controls, you may contact your Team Leader, email the Ethics Committee or call the Team Member Tipline.

68.    Accordingly, in light of Defendants' above-admissions combined with the

Company's clear governance policies and procedures, Defendants cannot now claim that

they were blamelessly unaware of the importance that the Company is operated lawfully and that its financial results are disseminated accurately. For the reasons discussed below, Defendants breached their fiduciary duties in this regard by allowing and/or causing the Company to engage in an illegal mislabeling/overcharging scheme, which not only defrauded consumers, but also rendered the Company's financial statements filed with the SEC and disseminated to shareholders false and misleading. This, in turn, has subjected the Company to significant legal action.

**B.     Pre-Relevant Period False and Misleading Statements**

69.     By way of background, even prior to the commencement of the Relevant Period, Defendants were routinely causing the Company to issue materially false and misleading statements, which failed to disclose, *inter alia*, that the Company was engaged in a scheme to systematically (and illegally) overcharge its customers and that, as a result, the Company's financial results were materially overstated and its internal controls were insufficient.

70.     For instance, on July 31, 2013, Defendants caused the Company to issue a press release announcing its third quarter fiscal 2013 financial results, reporting net income of $142 million, or $0.38 diluted earnings per share ("EPS"), sales of over $3 billion, gross profit of over $1.1 billion and comps of 7.5%. The release stated, in part, that "gross profit increased 61 basis points to 36.6% of sales driven by improvements in cost of goods sold and occupancy costs as a percentage of sales." The release went on to state that Whole Foods' "'outstanding operational performance is funding our growth, and our new stores are creating a cycle of innovation across the company.'"

71.     On the same day, Whole Foods hosted a conference call for analysts and

investors attended by defendants Robb, Meyer, Mackey and Lannon. During that call, defendant Meyer expressed pride in the Company's competitive pricing:

> We don't have to be ashamed compared to any other competitor for the exact same items we have great prices, and we're proud to show you about it and show it in our stores.

72.     Then, on August 9, 2013, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended July 7, 2013, repeating the false financial results reported in the July 31, 2013 press release and conference call, which Defendants stated were prepared in accordance with U.S. generally accepted accounting principles ("GAAP").[6]  In addition, during the 3Q13 conference call with analysts and investors, defendant Robb stated, "we remain committed to . . . improving our relative price positioning."

73.     The 3Q13 Form 10-Q was signed by defendant Flanagan and contained certifications required by Sarbanes-Oxley ("SOX Certifications") made by defendants Mackey, Robb and Flanagan, which stated:

---

[6] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a). On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a Replacement of FASB Statement No. 162*. FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009. The ASC did not change existing GAAP.

1.  I have reviewed this Quarterly Report on Form 10-Q of Whole Foods Market, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's

fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*         \*         \*

In connection with the Quarterly Report on Form 10-Q of Whole Foods Market, Inc. (the "Company") for the period ending July 7, 2013 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, [Mackey/Robb/Flanagan], certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o (d)); and

(2)      The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

74.      On November 6, 2013, Defendants caused the Company to issue a press

release announcing its fourth quarter and fiscal year 2013 financial results as follows:

|                | 4Q13            | FY13            |
|----------------|-----------------|-----------------|
| Net income     | $121 million    | $551 million    |
| EPS (diluted)  | $0.32           | $1.47           |
| Sales          | $2.976 billion  | $12.917 billion |
| Gross Profit   | $1.061 billion  | $4.629 billion  |

| Comps | 5.9% | 6.9% |
|-------|------|------|

75.     The release, quoting Mackey, stated in part that new store openings had driven increased financial performance:

> "We reported record fourth quarter operating results which contributed to the best fiscal year performance in our Company's 35-year history. *For the last four years, we have increased our new store openings while producing improvements in operating margin and higher returns on invested capital,* and we expect these trends to continue in fiscal year 2014."

76.     On the same day, November 6, 2013, Defendants caused the Company to host a conference call for analysts and investors, attended by defendants Robb, Mackey, Lannon, Gallo and Flanagan.   During the call, defendant Mackey reported the false financial results and falsely stated that the Company had addressed the pricing gap and was becoming more transparent:

> We have narrowed the price gap versus our competitors on known value items to its narrowest margin yet while continuing to raise the bar even higher on our standards of transparency.

77.     On November 22, 2013, Defendants caused the Company to file its Form 10-K with the SEC for the period ended September 29, 2013 (the "2013 Form 10-K"), which included false and misleading SOX Certifications by Mackey, Robb and Flanagan which were substantially similar to those quoted above.  The 2013 Form 10-K was signed by the following defendants:  Mackey, Robb, Flanagan, Elstrott, Sulzberger, Hassan, Kugelman, Seiffer, Siegel, Sokoloff, Sorenson, and Tindell.  In addition to reiterating the financial results reported on November 6, 2013, which Defendants stated were prepared in accordance with GAAP, the 2013 Form 10-K again highlighted Defendants' commitment to corporate responsibility and transparency:

> We seek to be a deeply responsible company in the communities where we do business around the world, ***providing ethically sourced, high-quality products and transparent information to our customers* . . . .**[7]

78.     On February 12, 2014, Defendants caused the Company to issue a press release announcing its first quarter fiscal 2014 financial results reporting net income of $158 million, or $0.42 diluted EPS, sales of $4.2 billion, gross profit of approximately $1.5 billion and comps of 5.4%.

79.     On the same day, Whole Foods hosted a conference call for analysts, media representatives and investors attended by defendants Robb, Mackey, Lannon and Flanagan. During that call, in addition to repeating the false financial results, Defendants made the following false and misleading statements assuring investors that the Company's current competitive pricing initiatives and their effect on the quarterly financial results would provide future benefit to customers and shareholders. Specifically, Defendants Robb and Lannon acknowledged the significance of competitive pricing and that Whole Foods, more competitive prices yielded more customers shopping and buying more products:

> [ROBB:] Our sales momentum and operating disciplines, along with moderating inflation, helped to generate another quarter of record gross margin for Q1. Occupancy leverage was partially offset by a slight increase in cost of goods sold, reflecting our expanded price investments. Our internal pricing surveys showed improvements from Q4 to Q1, in a competitive price positioning across virtually all competitors in all areas – known value items, non-perishables, and perishables. While we are seeing a sales and gross-margin impact, based on our prior experience we believe the impact will be short-term, and that our value strategy will benefit both customers and shareholders over the longer term.
>
> *       *       *
>
> [LANNON:] The good news about price investments is that in the short term it hurts comps, because if you have the same customers coming in and they're paying a little bit less per item, that's going to bring comps down.

---

[7] Unless otherwise noted, emphasis is supplied throughout.

But we found that after two or three quarters, the positive impact of lowering those prices begins to be felt in the comp base, as we begin to see our basket size increase, and we have on the margin more customers shopping with us. Short term, it's not good from a comp standpoint, but we think it's the right strategic move for the Company, and we believe it's going to pay off for our shareholders down the road.

80.    On February 21, 2014, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended January 19, 2014 which repeated the false financial results reported in the February 12, 2014 press release.  Defendants stated that the financial results were prepared in accordance with GAAP, and the results included the false and misleading SOX Certifications by defendants Mackey, Robb and Flanagan, substantially similar to those quoted above.  In the Results of Operations section of the 1Q14 Form 10-Q, Defendants caused the Company to state the following with respect to its financial performance:

The Company's gross profit as a percentage of sales was approximately 35.0% for both the sixteen weeks ended January 19, 2014 and the same period of the prior fiscal year. Gross profit as a percentage of sales increased six basis points for the sixteen weeks ended January 19, 2014 compared to the same periods of the prior fiscal year. The increase is a result of leverage in occupancy costs, which was partially offset by a slight increase in cost of goods sold as a percentage of sales, reflecting our expanded price investments. *These efforts include improving our relative price positioning, expanding our value offerings across the store, and increasing our promotional activity*.

81.    On March 12, 2014, defendant Robb spoke at the UBS Global Consumer Conference, a conference for analysts and investors.  Consistent with the Company's core marketing theme of strong values and customer trust, defendant Robb specifically identified Whole Foods as a leader of the natural products industry in large part because of Defendants' commitment to high standards and transparency of information:

29

Whole Foods Market has the highest standards in the supermarket industry of any company . . . .

The transparency that is going to continue to unfold over the coming years, that is where we are the leaders and we will continue to be the leaders.

\*          \*          \*

And it is not just the quality of the products; it is the quality of the standards behind the products.

82.      On May 6, 2014, Defendants caused the Company to issue a press release announcing its second quarter fiscal 2014 financial results, reporting net income of $142 million, or $0.38 diluted EPS, sales of $3.3 billion, gross profit of approximately $1.2 billion and comps of 4.5%.   On the same day, May 6, 2014, Whole Foods hosted a conference call for analysts, media representatives and investors attended by defendants Robb, Flanagan, Meyer, Gallo and Lannon.   During the call, Defendants again reiterated the false financial results published earlier that day, and the Company's purported value proposition, emphasizing its focus on beating the competition through cost-cutting and strategic pricing:

[MACKEY:] Our value strategy, while impacting our sales growth and gross margin year-to-date, has driven significant improvements in our relative pricing position, improvements of over 400 basis points in some cases. ***Based on our prior experience, we believe these investments will translate into higher sales growth over time. We have mentioned value*** [*i.e.*, pricing] ***several times today, which is certainly important as we seek to appeal to a broader customer base****. . . .*

\*          \*          \*

[ROBB:] There's some headwinds here and there's some quick changes in the marketplace. But this Company has 36 years of a track record of being the leader in the Nat food industry and ***continuing to make these investments strategically in price and in technology and differentiation and evolution****.* And I think over the long term this is the right path for us and we are absolutely 110% focused on this competitive battle.

30

*We will do what it takes to be competitive*. . . .

\*     \*     \*

[GALLO:] *[We are] really focused on being really competitive with our prices*. . . .

\*     \*     \*

[MACKEY:] One thing people don't quite understand is that when you lower a price, the first impact on it is it lowers your comps. *You're selling the same amount of product, for the most part, at a lower price.* So your sales are slightly lower.

*Over time, though, as people come to see that, you'll hopefully get lift on that item as people purchase more of it and the overall perception of your basic price value ratio is improved and it helps your overall sale.*

83.     On May 16, 2014, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended April 13, 2014 which repeated, in substance, the false statements reported in the May 6, 2014 press release, which Defendants stated were prepared in accordance with GAAP.  The Form 10-Q included the false and misleading SOX Certifications by defendants Mackey, Robb and Flanagan which were substantially similar to those quoted above. .

84.     The statements set forth above concerning the Company's financial statements, pricing and adequacy of internal controls were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by Defendants:

> a.  The Company's reported financial results were driven in part by systemic and pervasive overpricing and mispricing of prepackaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a

result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

b. Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its prepackaged foods, which defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

c. Whole Foods was then the subject of an ongoing, statewide investigation in California (with which it had already entered into a tolling agreement) of substantive and repeated weights and measures violations, including its failure to deduct the weight of containers, which would later result in significant fines, a permanent injunction and forced changes to its business practices;

d. Whole Foods' internal and disclosure controls were (and had already been proven to be) insufficient to prevent the Company from systemically overstating the weight of prepackaged foods and overcharging customers;

e. The quarterly and annual reports failed to disclose known trends, demands, commitments, events or uncertainties that Defendants reasonably expected would have a material unfavorable impact on revenues in violation of SEC Regulation S-K Item 303, "*Management's Discussion and Analysis of Financial Condition and Results of*

*Operations,*" ("Management's Discussion and Analysis") regarding Whole Foods' reported earnings and growth that were driven in part by systemic and pervasive overpricing of prepackaged perishable items, which comprised two thirds of the Company's sales.[8]  In addition, the quarterly and annual reports failed to disclose that the Company had entered into a tolling agreement with several California cities in February 2013, pertaining to an investigation into the failure to comply with applicable state laws regulating the advertising, weighing and pricing of grocery products, including systemic overcharging and knowingly marketing a short weight or taking a false tare on a container, at Whole Foods' California stores;[9]

    f.   Defendants' financial statements also were issued in violation of GAAP

---

[8] Regulation S-K Item 303(a)(3)(ii) and Instructions to Paragraph 303(a)(3) require companies:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

*     *     *

> The discussion and analysis shall *focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results* . . . .

*See, e.g., SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations,* Release Nos. 33-6835; 34-26831 (May 18, 1989).

[9] At the time of entry of the tolling agreement, Whole Foods conducted business as Whole Foods Market California, Inc. in Northern California and as Mrs. Gooch's Natural Foods Markets, Inc. in Southern California.

and SEC rules set forth below.

**C.      Whole Foods Comes Under Fire by the State of California**

85.      On June 11, 2014, after an investigation into Whole Foods' pricing at locations throughout California – Whole Foods' largest geographic market, at 73 stores (at the time) – the City Attorneys for Los Angeles, Santa Monica, and San Diego on behalf of the State of California filed a complaint against the Company, alleging that Whole Foods had violated California law by selling packaged items that contained less than the amount stated on the packaging, failing to deduct the tare weight when selling prepackaged items and selling items by unit when California law required them to be sold by weight.[10]  In the California Action, the State of California specifically alleged:

- Defendants made untrue or misleading statements in connection with the sale of items to the public in California, with statements constituting false advertising within the meaning of Cal. Bus. & Prof. Code §17500.

- Defendants did sell any item in less quantity than it was represented to be in violation of Cal. Bus. & Prof. Code §12024.2.

- Defendants did mark a short weight or taking a false tare on any container in violation of Cal. Bus. & Prof. Code §12021.

- Defendants did sell a prepackaged commodity in less quantity than represented in violation of Cal. Bus. & Prof. Code §Section 12024.3.

86.      On June 18, 2014, after what the State of California described as "lengthy negotiations," Whole Foods entered into a stipulation to settle the California Action, which was signed by John H. Hempfling II ("Hempfling"), Whole Foods Markets' Global Litigation Counsel, among others (the "California Stipulation").  Pursuant to the California

---

[10] *See generally People of the State of Cal. v. Whole Foods Mkt. Cal., Inc.*, No. SC122679, (Cal. Super. Ct. L.A. Cty.) (the "California Action").

Stipulation, Whole Foods agreed to pay $800,000 to settle the allegations regarding the overcharging of customers.  Additionally, Whole Foods agreed to a permanent injunction, which provided that the Company was "enjoined and restrained for a period of five years from the date of entry of . . . Final Judgment from engaging in any of the following [nine] acts or practices [including] [k]nowingly marking a short weight or taking a false tare on any container."  In addition to the fines, the California Stipulation placed requirements on the Company, which were known to Defendants, to create control and reporting mechanisms to address the violations for four years including, but not limited to, the following:

- Whole Foods shall appoint one central State Coordinator ("SC") for each California corporation who shall be responsible for overseeing the defendants' compliance program;

- Each Whole Foods store in California shall designate an employee or employees whose responsibilities shall include pricing accuracy in that store;

- Whole Foods' employees, or a third-party provider retained by Whole Foods, shall conduct random in-store price-checking audits in every store on a quarterly basis;

- Whenever a Whole Foods store leader receives a "Report of Pricing Discrepancy," the store leader shall promptly investigate whether there is an error; and

- When the SC receives a Report of Pricing Discrepancy, the SC shall promptly investigate whether a system error at the corporate level occurred.

87.     On June 26, 2014, in response to the California overcharging settlement, Defendants caused the Company to issue "An open letter to Whole Foods Market shoppers *in California and beyond*" in which the Company admitted to overcharging customers and acknowledged that such a violation of trust could affect whether customers would continue

to shop at Whole Foods.  The letter also emphasized the importance of customers' trust in Whole Foods, and again sought to distinguish Whole Foods from other grocers that may have had similar mispricing issues:

> [We are] well aware that any violation of [your] trust – however unintentional – can impact your feelings about shopping in our stores. We take our obligations to you very seriously and *we always strive for transparency and accuracy in everything we do*.
>
> \*          \*          \*
>
> *[W]e know we're not other retailers – we're Whole Foods Market, and we take pride in setting higher standards for quality and customer satisfaction that have helped push the entire grocery industry to do better*.

88.     After the Company had entered into the California Stipulation, Defendants, with knowledge or recklessness, continued to make the following materially false and misleading statements detailed below while failing to disclose continuing on-going violations and facts known to the Company.

**D.     Notwithstanding the Settlement of the California Action, Defendants Continue Causing the Company to Issue False and Misleading Statements**

89.     On July 30, 2014, Defendants caused the Company to issue a press release announcing its third quarter fiscal 2014 financial results, reporting net income of $151 million, or $0.41 diluted EPS, sales of $3.4 billion, gross profit of over $1.2 billion and comps of 3.9%. The release stated in part:

> "Our business model is producing industry-leading sales per square foot, healthy returns on invested capital and strong operating cash flow," said Walter Robb, co-chief executive officer of Whole Foods Market.

90.     On the same day, Whole Foods hosted a conference call for analysts, media representatives and investors attended by defendants Mackey, Robb, Flanagan, Gallo, and Lannon.  During that call, Defendants repeated the false financial results and defendant

Robb spoke about defendants' continued efforts to make Whole Foods' pricing competitive

and change the "Whole Paycheck" narrative:

> [ROBB:] *[W]e believe our value efforts continue to be a key element in driving sales growth over the long-term.* Last year, for the first time, we implemented a significant competitive price match on hundreds of grocery items at the national level.
>
> *Our focus going forward is primarily in perishables, where we see opportunities to narrow price gaps on select known value items, broaden our selection of products at entry-level price points, and increase promotions. . . .*
>
> *      *      *
>
> Natural and organic products are increasingly available, but no one does what we do. Our brand and our marketing campaign will highlight both our value and our values, *reinforcing our leadership around quality and transparency in the marketplace.*
>
> *      *      *
>
> [MACKEY:] The [Values Matter] campaign is going to be focused more on our differentiation, our values. *We're going to remind our customers, and also people who don't know Whole Foods very well, what we really stand for, and how we're different and better than many of our competitors.*

91.    On August 8, 2014, Defendants caused the Company to file its quarterly

report on Form 10-Q with the SEC for the period ended July 6, 2014 which repeated, in

substance, the false and misleading statements in the July 30, 2014 press release, which

Defendants stated were prepared in accordance with GAAP, and included the false and

misleading SOX Certifications substantially similar to those quoted above made by

defendants Mackey, Robb and Flanagan.

### E.    The Company Comes Under Fire From New York Regulators and Incredibly Continues to Issue False and Misleading Statements Under Defendants' Direction and on Their Watch

92.    The Relevant Period begins in August 2014 when, just weeks after paying

an $800,000 fine, agreeing to reform their weights and measures compliance program and promising the public that it would "strive for transparency and accuracy in everything we do," Whole Foods was once again caught overcharging customers in Albany, New York for prepackaged foods that weighed less than the labels indicated – the same problem at issue in California – resulting in thousands of dollars of fines.

93.     In the wake of the California permanent injunction and settlement and Albany, New York fine, Whole Foods, under Defendants' direction and on their watch, launched its first national advertising campaign in October 2014.  The campaign, called "Values Matter," represented Defendants' effort to "'distinguish what makes [Whole Foods] special, our food different and our quality superior.  It's our opportunity to reaffirm our unwavering commitments to our core values, which are at the heart of our brand.'"  By undertaking this effort on such a large scale, Defendants acknowledged that price integrity and transparency were material to Whole Foods' success and ability to grow revenues and margins.  One analyst noted that Whole Foods' campaign would "emphasiz[e] how Whole Foods is different from other grocers in terms of its quality [and] *transparency*" and stated that the Company's "decision to launch [the] campaign couldn't be more timely."

94.     On November 5, 2014, Defendants caused the Company to issue a press release announcing its fourth quarter and fiscal year 2014 financial results as follows:

|  | 4Q14 | FY14 |
| --- | --- | --- |
| Net income | $128 million | $579 million |
| EPS (diluted) | $0.35 | $1.57 |
| Sales | $3.256 billion | $14.194 billion |
| Gross Profit | $1.154 billion | $5.044 billion |
| Comps | 3.1% | 4.3% |

95.     On the same day, November 5, 2014, Whole Foods hosted a conference call for analysts, media representatives and investors attended by defendants Mackey, Robb,

Flanagan, Gallo and Lannon.   During the call, Defendants stated that the Company's ongoing advertising campaign called out what makes Whole Foods . . . different from its competitors and focused on product pricing to drive customer traffic:

> [MACKEY:] We remain committed to the highest quality standards and to expanding our value offering. Our value focus is on perishables, where we see opportunities to broaden our selection of products at entry-level price points, increase promotions and narrow price gaps on select known value items. We are encouraged by the pricing experiments we are running in several markets. . . .
>
> *     *     *
>
> [LANNON:] So we have – we feel like we are matching toe-to-toe with all of our competitors where we are doing these tests. And our customers are responding, transactions are up, unit growth is up. It's early days, but the first six weeks. And they are in the store, they are excited about buying those items, and then they continue to shop throughout the rest of the store. So it's definitely making us more nimble in those markets. And we're taking advantage of it.

96.     On November 21, 2014, Defendants caused the Company to file the 2014 Form 10-K with the SEC for the period ended September 28, 2014, which repeated the financial results reported on November 5, 2014, which Defendants stated were prepared in accordance with GAAP, and included the false and misleading SOX Certifications by defendants Mackey, Robb and Flanagan, which were substantially similar to those quoted above.   The 2014 Form 10-K was signed by the following defendants:  Mackey, Robb, Flanagan, Elstrott, Sulzberger, Hassan, Kugelman, Seiffer, Siegel, Sokoloff, Sorenson, and Tindell.   Defendants also reiterated their commitment to corporate responsibility and transparency:

> We seek to be a deeply responsible company in the communities where we do business around the world, providing ethically sourced, high-quality products and transparent information to our customers . . . .

97.     The statements set forth above concerning the Company's financial results,

transparency, pricing and adequacy of its internal controls were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by Defendants:

    a.  The Company's reported financial results were driven, in part, by systemic and pervasive overpricing and mispricing of prepackaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

    b.  Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its prepackaged foods, which Defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

    c.  Despite having entered into a settlement and permanent injunction in California where 20% of Whole Foods' stores are located, Defendants failed to implement sufficient processes to adequately address and prevent the pervasive tare weight errors going forward not just in California, but around the country;

    d.  Whole Foods' internal and disclosure controls were (and had already been proven to be) insufficient to prevent the Company from systemically overstating the weight of prepackaged foods and

overcharging customers;

e.  The statements in the Management's Discussion and Analysis section of the Form 10-K failed to disclose known trends, demands, commitments, and uncertainties regarding Whole Foods' business prospects as set forth above; and

f.  The Company's financial statements (issued by Defendants) also were in violation of GAAP and SEC rules set forth herein.

98.     In January 2015, for the second time in six months, inspectors in Albany, New York uncovered evidence that Whole Foods was misrepresenting the weight of prepackaged goods, resulting in overcharges to customers.  Once again, Whole Foods was fined thousands of dollars for these infractions.

99.     In addition, since agreeing to the injunction in June 2014 as part of the California Stipulation, Whole Foods had been the subject of additional weights and measures investigations in California in which the Company was found to have been continuing to misrepresent the weight of prepackaged goods.

100.    On February 11, 2015, Defendants caused the Company to issue a press release announcing its first quarter fiscal 2015 financial results, reporting net income of $167 million, or $0.46 diluted EPS, sales of $4.7 billion, gross profit of over $1.6 billion and comps of 4.5%.  The press release stated in part:

> "We are pleased with our first quarter results which reflect accelerating comparable store sales growth and healthy returns. We attribute our broad-based sales momentum to our customers' positive response to our many strategic initiatives, along with improving consumer confidence."

101.    On the same day, February 11, 2015, Whole Foods hosted a conference call for analysts, media representatives and investors attended by defendants Mackey, Robb,

Flanagan, Gallo, Lannon and Meyer.  During the call, defendant Robb reported on the results of Defendants' continued pricing initiatives in select markets:

> [ROBB:] *We continue to see unit lift from the lower produce pricing we are testing in several markets*, which included external marketing to support these investments. It is too early for conclusive results, particularly given the holidays. However, we're looking at expanding the test to additional markets as *we believe more competitive produce pricing will greatly benefit our overall value perception*.

102.    In a February 12, 2015 report, analysts at William Blair credited Whole Foods' pricing initiatives for its impressive quarter:

> Business momentum continues to improve with comp-store sales accelerating further thus far into the fiscal second quarter on both a one- and two-year basis, driven by a pickup in store traffic. *Importantly, the recent improvement appears largely driven by internal initiatives, including recent pricing and marketing investments* . . . .

103.    On February 27, 2015, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC which repeated, in substance, the financial results announced on February 11, 2015, which Defendants stated were prepared in accordance with GAAP.  The 1Q15 Form 10-Q included the false and misleading SOX Certifications by defendants Mackey, Robb and Flanagan, which were substantially similar to those quoted above.

104.    Also on February 27, 2015, the Company hosted its first-ever Investor Conference at its headquarters in Austin, Texas.  Defendants Mackey and Robb discussed the importance of Whole Foods' relationship of trust with its customers and that the Company was continuing to reach for new levels of transparency and accountability. Defendants also reiterated that values are important to the Company but that "value," *i.e.*, price matters too:

[MACKEY:] We are excited about taking back control of our brand. We think it's been misrepresented and misunderstood. And the Values Matter campaign really allowed us to focus in and communicate to our team members, to our customers, and to the investment community exactly what Whole Foods stands for.

\*      \*      \*

[ROBB:] And again, I would say to you that people may have an opinion about Whole Foods one way or the other, *but one thing they might give you is that in fact people do trust us*. They trust us for the quality that we offer. *And that is a currency of building relationships with customers in the 21st century* . . . .

\*      \*      \*

[W]e're going to be relevant on the price areas that we need to be. *But we are going to focus on building a new race to the top*, because we think this marketplace is just opening up in ways we never imagined, that *we're going to concentrate in building that new top for this industry: new levels of quality, new levels of transparency, new levels of accountability across the entire business*.

\*      \*      \*

[MACKEY:] Well, we know that, as you can see from our anthem, *we believe values matter . . . . But we also know it's important that we be relevant on price. We know that also values matter but value matters too and so we have made investments in price in selected markets* and we've done a lot of experiments on it.

105.    Analysts' response to Whole Foods' Investor day event was positive, reporting that their "confidence was increased" and that the event "renewed" their "appreciation for the company's growth opportunity, differentiated concept and management team." On February 27, 2015, analysts at Morgan Stanley wrote:

We are positive on WFM following its first ever investor day – *management demonstrated both what makes Whole Foods great and how they plan to expand WFM's leading position going forward*. We see a long runway ahead for this natural/organic leader. . . .

. . . As the company has done for the past 3+ decades, Whole Foods is staying at the forefront of trends in natural foods retailing, never standing

43

still in the face of competition. ***Whole Foods is increasing transparency with both investors and customers, which we believe is the right strategy for sustained loyalty to WFM long-term.***

*       *       *

- **Value Efforts**: Price investments to-date have largely focused on produce –Whole Foods is undergoing 6-7 different pricing experiments across the country, with plans to expand over time. . . . ***Bigger picture, management is focused on the differentiated store experience but understands WFM needs to remain relevant on price as well.***

106.   On March 1, 2015, Sterne Agee analysts reported that:

Whole Foods continues to take the approach that it is not participating in a race to the bottom, but instead is looking to create a new race to the top in terms of **new levels of product** (i) quality, ***(ii) transparency, and (iii) accountability***. First, Whole Foods continues to add value by developing higher standards, such as the company's recently launched Responsibly Grown produce rating system. Such programs, along with several others (60% of grocery sales are certified organic), have **raised the Whole Foods brand as the best quality in the industry. As a result, shoppers trust each and every item in the store** – a huge advantage for the company, particularly as more U.S. households look to eat healthier.

107.   The statements set forth above concerning pricing were each materially false and misleading when made because they omitted the true facts, which were then known to or recklessly disregarded by the Defendants:

    a.  The Company's reported financial results were driven, in part, by systemic and pervasive overpricing and mispricing of prepackaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

    b.  Whole Foods routinely overcharged customers and engaged in known

and preventable weights and measures violations on its prepackaged foods, which Defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

c.  Despite having entered into a settlement and permanent injunction in California where 20% of Whole Foods' stores are located, Defendants failed to implement sufficient processes to adequately address and prevent the pervasive tare weight errors going forward not just in California, but around the country;

d.  Whole Foods was then the subject of an ongoing, investigation in New York City of substantial and repeated weights and measures violations, including its failure to deduct the weight of containers, which would later result in significant fines and changes to its business practices;

e.  Whole Foods' internal and disclosure controls were (and had already been proven to be) insufficient to prevent the Company from systemically overstating the weight of prepackaged foods and overcharging customers;

f.  The statements in the Management's Discussion and Analysis section of the 1Q15 Form 10-Q failed to disclose known trends, demands, commitments, and uncertainties regarding Whole Foods' business prospects as set forth above; and

g.  The Company's financial statements (issued by Defendants) also were

in violation of GAAP and SEC rules set forth herein.

108.    On May 6, 2015, Defendants caused the Company to issue a press release announcing its second quarter fiscal 2015 financial results, reporting net income of $158 million, or $0.44 diluted EPS, sales of $3.6 billion, gross profit of $1.3 billion and comps of 3.6%. The release stated in part:

> "Our results reflect another quarter of record sales and healthy returns on invested capital," said John Mackey, co-founder and co-chief executive officer of Whole Foods Market. "*Our Whole Foods Market brand has helped lead the shift in consciousness toward fresh, healthy foods by offering the highest quality, broadest selection, and best customer service . . . .*"

109.    On May 15, 2015, Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended May 6, 2015, which repeated the false financial results repeated in the May 6, 2015 press release, which Defendants stated were prepared in accordance with GAAP, including the false and misleading SOX Certifications substantially similar to those quoted above made by defendants Mackey, Robb and Flanagan.

110.    The statements set forth above were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by Defendants:

a. The Company's reported financial results were driven, in part, by systemic and pervasive overpricing and mispricing of prepackaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

b. Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its prepackaged foods, which Defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

c. Defendants failed to implement sufficient processes to adequately address and prevent the pervasive tare weight errors going forward not just in California and New York (where 23% of Whole Foods' stores are located) but around the country;

d. Whole Foods' internal controls were (and had been proven to be) insufficient to prevent the Company from systemically overstating the weight of prepackaged foods and overcharging customers;

e. The statements in the Management's Discussion and Analysis section of the 2Q15 Form 10-Q failed to disclose known trends, demands, commitments, and uncertainties regarding Whole Foods' business prospects as set forth above; and

f. The Company's financial statements (issued by Defendants) also were in violation of GAAP and SEC rules set forth herein.

## F.  The New York City DCA Reveals Its Investigation of Whole Foods

111.   On June 24, 2015, the New York City DCA announced it had uncovered systematic overcharging for prepackaged foods at *all* of Whole Foods' New York City locations.  In a press release issued on that date, DCA explained:

47

Department of Consumer Affairs (DCA) Commissioner Julie Menin today announced an ongoing investigation into Whole Foods after finding that the company's New York City stores routinely overstated the weights of its prepackaged products – including meats, dairy and baked goods – resulting in customers being overcharged. DCA tested packages of 80 different types of pre-packaged products and found *all of the products had packages with mislabeled weights.* Additionally, *89 percent of the packages tested did not meet the federal standard for the maximum amount that an individual package can deviate from the actual weight,* which is set by the U.S. Department of Commerce. The overcharges ranged from $0.80 for a package of pecan panko to $14.84 for a package of coconut shrimp.

DCA's findings point to a *systematic problem with how products packaged for sale at Whole Foods are weighed and labeled.* The snapshot suggests that individual packages are routinely not weighed or are inaccurately weighed, resulting in overcharges for consumers. . . . In some cases, *this issue was found for the same exact products at multiple stores.*

\*          \*          \*

"Our inspectors tell me this is *the worst case of mislabeling they have seen in their careers*, which DCA and New Yorkers will not tolerate. . . ."

DCA regularly inspects all of the city's supermarkets for scanner and scale accuracy, pricing, and charging tax on non-taxable items. *Last fall, DCA conducted in-depth inspections into how Whole Foods was weighing and labeling its pre-packaged foods and discovered troubling issues with their labeling of the weight of pre-packaged foods. This winter, DCA revisited several stores and found products continued to be mislabeled.* . . .

*. . . The potential number of violations that Whole Foods faces for all prepackaged goods in the NYC stores is in the thousands.*

112.    On June 24, 2015, *The New York Times* published an article entitled "Whole Foods Accused of Overcharging in New York City Stores." The article further discussed the DCA's findings specifically noting that according to Julie Menin, commissioner of the DCA, that the same mispricing violations for which Whole Foods had been permanently enjoined in California were also permeating the New York City market. The article further

referenced the Company's Chief Litigator, Mr. Hempfling,[11] acknowledging that the

Company had known about the DCA's concerns since December 2014:

> The New York Department of Consumer Affairs accused Whole Foods Market on Wednesday of overstating the weight of some prepackaged products sold in the company's stores in the city.
>
> Tests of 80 different prepackaged products bought in the company's nine New York stores showed that all were labeled with erroneous weights, the department said.
>
> In one case, the department said consumers buying vegetable platters priced at $20 each were overcharged an average of $2.50. In another example, eight packages of chicken tenders priced at $9.99 a pound on average cost $4.13 more than they should have.
>
> John Hempfling, chief litigator for Whole Foods, said *the company had been working to address the city's concerns since December*, walking officials through its auditing and training programs and having them meet with regional executives.
>
> "They've never provided any evidence," Mr. Hempfling said. "*All I've seen from them is the violation sheets*."
>
> He said that made it hard for the grocer to assess the city's report.
>
> *Julie Menin, commissioner of the Department of Consumer Affairs, disputed that, saying that her agency met with Whole Foods in February, had repeated conversations with the company and had provided it with more than 90 pages of what she called "detailed violation data*."
>
> "We have repeatedly asked Whole Foods to provide us with evidence that they have fixed this problem – the same problem that existed in California and clearly exists in New York City," Ms. Menin said. "They have failed to do so, which is why we are continuing our investigation."
>
> *                 *                 *
>
> [Hempfling] said the city had been doing its investigation in many New York City groceries and questioned why Whole Foods was the only grocer cited.

---

[11] As discussed above, Mr. Hempfling acted on Whole Foods' behalf in the California Action and signed the California Stipulation for Whole Foods.

Last year, Whole Foods paid an $800,000 fine in California after Santa Monica, Los Angeles and San Diego brought a civil protection case against the chain, accusing it of overcharging customers.

Mr. Hempfling said the company planned to fight the fines sought by New York, however, because **they were "*excessive*.**

The Department of Consumer Affairs said the fine in New York for falsely labeling a package was as much as $950 for the first violation and up to $1,700 for a subsequent violation.

113.   On June 29, 2015, defendants Robb and Mackey posted a video to the Company's website to admit and "own" the pricing issues identified by the DCA:

Hi. I'm Walter Robb, and together with John Mackey we serve as the co-CEO's of Whole Foods Market and *we want to talk directly with you this morning about certain pricing issues you may have heard about* in our New York City stores. *Straight up, we made some mistakes. We want to own that* and tell you what we're doing about it.

114.   "A Message to Whole Foods Market Customers" posted with the video stated that:

We are improving our training regarding in-store packaging, weighing and labeling processes. Additionally, we have implemented a companywide third-party auditing process for all of our stores, and we will provide an update in the next 45 days so that customers can follow our progress.[12]

115.   On July 2, 2015, SunTrust Robinson Humphrey analysts issued a report entitled "WFM Reacts to 'Thumb-on-Scale' Charges":

**Whole Foods Market, Inc. is in the news this morning . . . . *with a surprising apology for inaccurate pricing in its NYC stores*.** This follows recent charges by NYC's Department of Consumer Affairs that WFM was overcharging customers based on weight discrepancies.

**After initially denying the claims, management decided to "come clean," *presumably after conducting an internal investigation*.** The incorrect charges, according to the company, went "both ways" and only took place in a small portion of the assortment. (We would also point out that WFM only has about 6 NYC stores which constitute 1.5% of the chain).

---

[12] As of the date of the filing of this Complaint, Plaintiff's counsel is not aware of any audit that has been provided to customers.

Along with the apology, management promised to tighten procedures chain-wide and follow up with periodic (and published) audits.
(Emphasis and alteration in original.)

116.    Also on July 2, 2015, *USA Today* published an article titled "Whole Foods

execs apologize for overcharging," which discussed the apologetic video posted by

defendants Robb and Mackey on the Company's website and the DCA's reaction to it:

Whole Foods executives apologized via a blog post and video this week after New York City's Department of Consumer Affairs alleged they had been routinely mislabeling packages with the wrong weights.

Whole Foods top executives said they "made some mistakes" in a video posted to the company's blog after an investigation in New York City claimed the high-end grocery chain consistently overcharges for prepackaged food.

"Straight up, we made some mistakes, we want to own that," co-CEO Walter Robb said alongside co-CEO John Mackey.

\*       \*       \*

The New York City Department of Consumer Affairs released the results of an investigation on June 24 that alleged the area's Whole Foods stores had consistently listed improper weights on prepackaged food, resulting in overcharges from 80 cents to nearly $15 an item. . . .

\*       \*       \*

In the blog post, the company disputes the department's claims that it systematically overcharges customers. But said "we apologize to our customers for any discrepancies that may have occurred."

**DCA Commissioner Julie Menin issued a statement saying her department is "gratified . . . Whole Foods is admitting the deficiencies in how they label their prepackaged foods.**" She also said the DCA "will remain vigilant and hold Whole Foods and other supermarkets accountable for any misleading and deceptive practices."

117.    On July 6, 2015, *Forbes* published an article by Clark Wolf, which noted,

in relevant part, that Whole Foods had been caught "*[t]wice, on two coasts. Record making*

*overcharging*." The article continued:

I certainly ***do not*** believe there's a paragraph in the employee manual on how to overcharge. But I suspect the sort of care we seek is upended by pressure on managers and regionals to produce revenues and profits, save money, not spend too much on training – and a general experience of a strong customer base that really doesn't look at price too closely. I know I don't. When I go into an obviously expensive store I suspend disbelief a bit. The price/value war is on hold unless something really unacceptable pops into clear view. It's worth it to me; to feel the luxury of trust.

(Emphasis in original.)

### G.     The Company is Severely Damaged as a Result of Defendants' Breaches

118.    On July 29, 2015, after the market closed, Defendants caused the Company to issue a press release announcing its third quarter fiscal 2015 financial results for the third quarter ended July 5, 2015.  Defendants reported net income of $154 million, or $0.43 diluted EPS, sales of over $3.6 billion, gross profit of over $1.2 billion and comps of 2.2%, comprised of 2.6% for the first ten weeks of the quarter and 0.4% for the final two weeks of the quarter after the New York City DCA investigation was revealed.  The financial results fell far below analyst revenue and earnings expectations due to slow sales stemming from the overpricing charges.

119.    After releasing its third quarter fiscal 2015 financial results on July 29, 2015, Whole Foods held a conference call for analysts, representatives and investors attended by defendants Mackey, Robb, Lannon and Gallo during which Defendants addressed the impact of the DCA's accusation of overcharging consumers.  Defendant Robb remarkably claimed that as opposed to the DCA's findings which the Company (under Defendants' direction and on their watch) previously admitted to, that the issues were not systemic.  Rather than emphasizing the differentiating factors of Whole Foods, defendant Robb conveniently stated that these "weights and measures issues . . . can be

found at any supermarket":

> [ROBB:] ***Comps dropped sharply in week 11, after our New York City weights and measures audit received national media attention***, and averaged just 0.4% for the last two weeks of the quarter. We have seen a slight improvement in trends fourth quarter to date; however, comps are still well below our 2.5% average for the 19 weeks prior to the negative publicity. . . .
>
> I want to take a moment to address the New York City weights and measures audit. As soon as the New York City Department of Consumer Affairs came to us, we worked to understand and address the issues to prevent them from happening again. ***I want to emphasize these were not systematic, but rather caused by inadvertent human error. The audit includes errors that were favorable to customers as well. These are weights and measures issues that can be found at any supermarket.***
>
> ***Clear and transparent pricing is integral to how we operate.*** We have taken immediate steps to address these issues, including improving our training regarding in-store packing, weighing, and labeling processes; and expanding our third-party auditing process Company-wide. ***We've built our business on the core value of satisfying and delighting our customers; it is what our customers have grown to love and expect from us. And our approach to pricing transparency is no different.*** If a price is not accurate and not priced in the customer's favor, then that item is free to the customer, no charge, no question.

120.    Following these revelations, securities analysts had many questions for defendants on the call:

> [ANALYST:] Walter, when you look at the slowdown over the past five weeks, how can you guys be so precise that the New York audit is the primary factor? And I guess ***more importantly, what steps are you taking to fix the problem*** . . . .
>
> [ROBB:] . . . ***And clearly it affected the comps.*** Clearly, there's other factors at work here too, in terms of the headwinds from the previous year's strong sales and so forth. ***But by any measure, it had significant impact on our sales.***
>
>    \*   \*   \*
>
> [FLANAGAN:] ***The impact was really felt across the whole country, not in New York City. This was national news.*** So looking at what is happening

in the New York market is really not the right way to look at it. It's looking at it across the whole Company . . . .

121.    As a result of these disclosures, Whole Foods stock declined $4.74 per share to close at $36.08 per share on July 30, 2015.

122.    On July 30, 2015, several analysts commented on the impact of this news on Whole Foods' stock price, traffic and sales:

- A Deutsche Bank analyst emphasized "What Goes Around Comes Around," and stated that "[i]t is clear WFM's over-charging mishap negatively impacted traffic" and "[a]s a result, WFM is now faced with the arduous task of both regaining trust, while at the same time overcoming the 'Whole Paycheck' image." The analyst noted that the "that the process of rebuilding trust with customers will take time and could act as a headwind for the next few quarters and, potentially, years."

- Analysts at Morgan Stanley attributed Whole Foods' decreased sales at the end of 3Q15 and the beginning of 4Q15 directly to the Company's overcharging in New York, stating that "[w]hat most had thought to be a fairly localized issue in the news recently, [the pricing audits] greatly impacted corporate comps."

- Analysts at Jefferies attributed Whole Foods' 3Q15 earnings miss to lower same store sales (comps) caused by Whole Foods' overcharging in New York, stating that "*[o]vercharging scandal in NY stalls comps*," and that "[a]fter posting a 2.6% comp for the first 10 weeks of 3Q, trends slowed abruptly on negative media coverage of a NY weights/measures audit showing that WFM was overcharging its consumers."

- SunTrust Robinson Humphrey analysts similarly attributed the precipitous drop in Whole Foods' stock price to the widespread overcharging in New York, stating that the "*[a] big portion of the shortfall evidently came from the pricing "scandal" in NYC in June . . . this factor alone seemed to cause comps to decelerate from 2.6% (the QTD run rate at that point) to 0.4% in the last two weeks of the period.*

123.    On August 4, 2015, despite agreeing to the California Stipulation, which required Whole Foods to obey each of the California pricing and weights and measures

laws claimed to have been violated and to institute a comprehensive, detailed statewide compliance program at each of their nearly 80 California stores "to promote pricing accuracy" and ensure compliance with the injunction, Whole Foods sought *ex parte* relief from the Superior Court for Los Angeles County regarding the construction of the California Stipulation because "[v]arious counties have and continue to impose administrative penalties on Whole Foods" since entry of the judgment approving the terms of the California Stipulation. Stated differently, ***Whole Foods has continued to commit weights and measures violations in California*** and its so-called "compliance program" has failed to prevent such violations. Notably, in response to Whole Foods' characterization of these continued violations as human error "one-offs" during the October Hearing, a Deputy City Attorney for Los Angeles explained:

> [I]t's not so black and white as either a conspiracy and systemic intentional problem versus just harmless human error. It's mostly in between. And it's mostly they are high volume. ***This case was based on a high volume of errors that occurred over and over and weren't fixed. And the company knew about them and didn't fix them***.

124. Whole Foods' sales and revenue have yet to recover from the pricing scandal and revelations that the Company (under Defendants' direction and on their watch) routinely overcharged customers. For instance, on November 4, 2015, Defendants caused the Company to announce its quarterly results for the fourth quarter, which spanned July 6, 2015 – just a week after the DCA investigation was announced – through September 27, 2015, acknowledging the need to "[r]ebuild sales" and that comparable store sales on a constant currency basis had declined. Defendant Robb stated that "[w]e recognize the need to move faster and go deeper to ***rebuild traffic and sales*** and create a solid foundation for long-term profitable growth and are taking the necessary steps to better communicate our

differentiation, improve our value perception, and fundamentally evolve our business."

125.    During the conference call later in the day on November 4, 2015, defendant Mackey outlined the Company's new nine-point plan to rebuild sales momentum and acknowledged "that we recognize we have our work cut out for us.  We believe we are taking the necessary steps to regain our sales momentum, fundamentally evolve our business model, and produce the returns that the investment community expects from us, and that we expect from ourselves."  On this disclosure, the price of Whole Foods common stock declined $1.16 per share between November 3, 2015 and November 5, 2015.

126.    On December 28, 2015, after the market closed, the New York City DCA announced that Whole Foods agreed to pay $500,000 to settle DCA's claims that the Company mislabeled prepackaged goods in its New York City stores.  In addition to the monetary payment, the agreement also required Whole Foods to conduct quarterly in-store audits of at least 50 products from 10 different departments at all New York City stores, and to correct all inaccuracies.  The agreement further required Whole Foods to implement and enforce policies and procedures that forbid employees from merely estimating the weight of a package, and to conduct training for all New York City employees responsible for weighing and labeling prepackaged goods.  Additionally, if the City's auditors found labeling errors in follow-up inspections, the store must remove all mislabeled products, and all New York City stores must verify the pricing accuracy of that product and 20 additional products from the same department, within 15 days.

127.    Announcing the settlement, DCA Commissioner Julie Menin stated, "'After discovering the *troubling and repeated mislabeling of pre-packaged goods at Whole Foods* last year, we are happy to have reached an agreement with Whole Foods that will

help to ensure New Yorkers are better protected from overcharging.'"  In line with their prior failures to accept responsibility whatsoever, Defendants caused the Company to respond, stating that DCA "misrepresented" the agreement and that there was "no evidence of systematic or intentional misconduct."

128.    Most recently, the Company (under Defendants' direction and on their watch) has been accused of destroying evidence in a related consumer class action in which the Company was charged with concealing the amount of sugar in its Greek yogurt.[13]  A *Law 360* article entitled "Whole Foods Destroyed Evidence, Yogurt MDL Plaintiffs Say" reported, in pertinent part:

> Law360, Los Angeles (March 4, 2016, 8:35 PM ET) -- A group of consumers in multidistrict litigation accusing Whole Foods of concealing the amount of sugar in its Greek yogurt told a Texas federal judge Friday that the upscale grocer knowingly destroyed all yogurt samples and asked the court to impose sanctions.
>
> The consumers said Whole Foods Market Inc. pulled the product entirely from its shelves three weeks after the first putative class action was filed but reassured the plaintiffs that samples were being saved. But in December, Whole Foods said it didn't have any samples and believes that all of the voluntarily withdrawn product was destroyed, and that the yogurt manufacturer and co-defendant Skotidakis Inc. also didn't have any samples, according to the plaintiffs' motion for a finding of spoliation.
>
> "Whole Foods has utterly failed in its legal duty to preserve relevant evidence in its custody and control," the 24-page filing states. "Almost a year and a half after this case was filed, plaintiffs have now been told that the entire stock of the yogurt in the custody of defendants — the most important single piece of evidence in this case — has been knowingly destroyed."
>
> The group is asking that Whole Foods reveal every detail about the alleged destruction of evidence in order to determine if it was intentional and conducted in bad faith, and asked the court to allow it to conduct additional discovery at Whole Foods' expense.

---

[13] *See In Re: Whole Foods Market, Inc., Greek Yogurt Marketing and Sales Practices Litig.*, Case No. 1:14-MC-02588 (W.D. Tex. Filed Dec. 12, 2014).

The consumers also asked U.S. District Judge Sam Sparks to impose sanctions in the form of barring Whole Foods from contesting the legal or factual sufficiency of plaintiffs' independent testing of samples taken from Whole Foods store shelves, which revealed six times the sugar content than stated on the products' label.

In February, Judge Sparks had dismissed the case with leave to amend, saying the consumers' independent tests and separate testing by Consumer Reports didn't meet standards set by the U.S. Food and Drug Administration, which requires 12 random samples taken from 12 different "shipping lots."

On Friday, the consumers said this was now impossible, given that no samples of the yogurt exist, aside from a few products the plaintiffs purchased off the shelf from Whole Foods which do not contain any information about which shipping lots they originated from.

"Defendants' own spoliation makes it impossible to perform that very protocol — or any other additional testing utilizing defendants' samples — and prevents plaintiffs from curing this asserted pleading 'defect,'" the motion states.

A Whole Foods spokeswoman said the company disputes the spoliation claims, calling the allegations unfounded.

"Whole Foods Market took reasonable steps to preserve relevant evidence for this case and we believe there is more than sufficient evidence supporting that fact," the spokeswoman said.

A representative for the consumers didn't immediately respond to a request for comment on Friday.

After its creation in December 2014, the MDL has swelled to include 21 claims covering 10 states, as well as a national subclass.

The consumers said that Whole Foods sells its Greek yogurt in all of its 347 stores across the country and that the company's refusal to initiate a recall was "egregious."

Whole Foods asked the court to toss the case in October, telling Judge Sparks that the consumers' claims were not only preempted but also vague and implausible. Whole Foods noted that Consumer Reports determined that its yogurt has the "highest level of overall nutrition" and contains about the same amount of sugar as competing brands.

The consumers countered in December that they didn't have to show that they actually relied on Whole Foods' statements about the sugar in its yogurt when making their purchases and said it wouldn't be reasonable to expect them to independently test 12 samples before discovery has begun.

Judge Sparks disagreed, however, stating that their complaint explicitly claimed that Consumer Reports didn't follow federal testing standards and rejected what he interpreted as a "special exemption" from pleading requirements.

The judge said the plaintiffs have had plenty of time to conduct discovery to support their claims but instead relied on methodology that they should have known was inconsistent with what they would have to prove in order to succeed in their suit.

The consumers filed a third amended complaint on Friday which includes many of the same arguments presented in the spoliation motion.

129.    Finally, the price of the Company's stock still has not recovered and currently trades for around $33 per share.  By way of comparison, Whole Foods stock traded as high as over $56 per share in February 2015.

130.    Accordingly, as a result of Defendants' breaches, the Company has been (and continues to be) damaged.

### H.    Defendants Caused the Company to Issue Financial Statements that were Materially Misstated in Violation of GAAP and GAAP and SEC Disclosure Rules

131.    As discussed above, Defendants caused the Company to falsify its financial results reported in its public financial statements by artificially inflating revenues in violation of GAAP and SEC rules.  These GAAP violations resulted in the overstatement of the Company's sales, gross profit, net income and EPS.[14]

---

[14] Whole Foods' financial statements issued during the Relevant Period were included in Forms 10-Q and Forms 10-K filed with the SEC specifically, albeit falsely stating that the financial statements were prepared in accordance with GAAP.  Additionally, as alleged above, defendants Mackey, Robb and Flanagan also certified that the Company's financial statements did not contain untrue statements of material fact.  The Relevant Period financial statements, however, falsely reported total sales due to the Company's

132.    As detailed herein, the Company's financial statements were issued in violation of GAAP and SEC rules, wherein Defendants caused the Company to misstate revenue in cases where prepackaged goods were mispriced/overpriced. As revealed by the California and New York investigations, Whole Foods (under Defendants' direction and on their watch) routinely overweighed its prepackaged goods, including failing to deduct the tare weight when selling prepackaged items, resulting in its customers being overcharged. As specifically revealed in the New York investigation, these overcharges ranged from $0.80 for a package of pecan panko to $14.84 for a package of coconut shrimp. The issue was not isolated as the overcharging scheme affected the same products at multiple stores. The findings as described by regulatory agencies, revealed a systemic problem with how products packaged for sale at Whole Foods were being weighed and labeled. As a result of the overcharges, Defendants improperly inflated the Company's revenues in violation of GAAP, which also resulted in overstatements of net income, EPS and gross profits.

133.    SEC Staff Accounting Bulletin ("SAB") Topic 13: Revenue Recognition,[15] §A1, sets forth several criteria that must all be met before revenue may be recognized, including that: the seller's price to the buyer is fixed or determinable; collectability of the sales price is reasonably assured; delivery has occurred or services have been rendered;

---

overcharging of customers by overstating the weights of its pre-packaged products. As a result, Whole Foods' financial statements were not prepared in accordance with GAAP for all the reasons detailed herein.

[15] SAB Topic 13 represents the codification of certain Staff Accounting Bulletins, including SAB No. 101 – Revenue Recognition in Financial Statements as of May 9, 2003. On December 17, 2003, SAB Topic 13 was revised by SAB No. 104: Revenue Recognition. Such revisions have been incorporated in all references to SAB Topic 13. FASB incorporated the guidance from SAB Topic 13 into its codification at ASC 605-10-S99.

and persuasive evidence of an arrangement between the Company and the customer must

exist:

> The staff believes that revenue generally is realized or realizable and earned
> when all of the following criteria are met:
>
> - Persuasive evidence of an arrangement exists [FN3 with the term
>   "arrangement" meaning "*the final understanding between the
>   parties as to the specific nature and terms of the agreed-upon
>   transaction*"],
>
> - Delivery has occurred or services have been rendered,
>
> - The seller's price to the buyer is fixed or determinable, and
>
> - Collectability is reasonably assured.
>
> SAB Topic 13, §A1, ASC 605-10-S99-1.

134.   In addition, Defendants caused the Company to violate the overarching

accounting principle that revenues and gains should not be recognized in financial

statements until they are both earned and realizable (ASC 605-10-25-1, referencing FASB

Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in

Financial Statements of Business Enterprises,* ¶83(a)-(b)):

> a.   "Revenues and gains generally are not recognized until realized or
>
> realizable.  Revenues and gains are realized when products (goods or
>
> services), merchandise, or other assets are exchanged for cash or claims
>
> to cash.  Revenues and gains are realizable when related assets received
>
> or held are readily convertible to known amounts of cash or claims to
>
> cash." ASC 605-10-25-1; and
>
> b.   "Revenues are not recognized until earned.  An entity's revenue-earning
>
> activities involve delivering or producing goods, rendering services, or

other activities that constitute its ongoing major or central operations, and ***revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues***." ASC 605-10-25-1.

135.    By overcharging customers on its prepackaged products, Whole Foods had not "earned" or "realized" the full amount of revenues the Company was recognizing because the inaccurate weighing led to consumer overcharges which inflated sales in violation of GAAP and SEC rules.  This GAAP violation of basic revenue recognition principles resulted in false financial statements issued during the Relevant Period that materially overstated sales, gross profits, net income and EPS.

136.    Also, the Company's systemic overcharging of its customers and improper inflation of reported sales, gross profits, net income and EPS resulted in the Company violating SEC Regulation S-K Item 303, 17 C.F.R. §229.303.  SEC Regulation S-K Item 303 requires a discussion of results of operations and other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations.  Regulation S-K Item 303 requires a company to disclose "***any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations***."  17 C.F.R. §229.303(a)(3)(ii).

137.    In violation of Regulation S-K Item 303, Defendants caused the Company to fail to disclose its improper practice of overpricing or mispricing prepackaged foods, which was materially overstating sales and would lead to an unfavorable trend for the Company on ongoing sales due to a lack of trust with their customers.

138.    Defendants' false and misleading Relevant Period financial statements, and their misleading omissions regarding Whole Foods' accounting for revenues were unquestionably material.  SEC SAB Topic 1M, *Materiality*, states that "[a] matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative as well as quantitative considerations.  For example, if a misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.  Further, whether the misstatement concerns a portion of the registrant's business that has been identified as playing a significant role in the registrant's operations and profitability should be considered in determining materiality.  Finally, whether the ***misstatement affects the registrant's compliance with regulatory requirements*** should also be considered in evaluating materiality or whether the ***misstatement involves concealment of an unlawful transaction*** should also be considered in evaluating materiality.

139.    Under these guidelines, Defendants' overstatement of revenues was material because the overstatement caused a significant negative reaction to Whole Foods' current and future business.  Further, because the Company's prepackaged perishable items comprised two thirds of the Company's sales, the overstatement impacted a portion of Whole Foods' business that played a significant role in its operations and profitability. Finally, the California and New York violations disclosed that Whole Foods was not complying with New York and California State regulatory requirements and involved concealment of unlawful transactions.  Accordingly, the Company's Relevant Period figures and financial reporting issued or caused to be issued by Defendants were material

misstatements under GAAP and SEC rules.

## DERIVATIVE AND DEMAND ALLEGATIONS

140.    Plaintiff brings this action derivatively in the right and for the benefit Whole Foods to redress the breaches of fiduciary duty and other violations of law by Defendants.

141.    Plaintiff will adequately and fairly represent the interests of Whole Foods and its shareholders in enforcing and prosecuting its rights.

142.    On November 6, 2015, Plaintiff issued the Demand pursuant to Texas law on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company related to the allegations and events set forth herein. *See* Exhibit A.

143.    The Demand was received by a Company agent on November 10, 2015. *See* Exhibit B.

144.    Pursuant to Tex. Business Organizations Code § 21.553:

DEMAND. (a) A shareholder may not institute a derivative proceeding until the 91st day after the date a written demand is filed with the corporation stating with particularity the act, omission, or other matter that is the subject of the claim or challenge and requesting that the corporation take suitable action. (b) The waiting period required by Subsection (a) before a derivative proceeding may be instituted is not required if: (1) the shareholder has been previously notified that the demand has been rejected by the corporation; (2) the corporation is suffering irreparable injury; or (3) irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.

145.    Pursuant to Texas law, Plaintiff waited ninety (90) days for a response. However, after ninety-one (91) days had elapsed, Plaintiff had still received no response to the Demand whatsoever. This in and of itself constituted a wrongful refusal.

146.    Nonetheless, on February 13, 2016, Plaintiff's counsel sent the February 13th Letter to the Board. The February 13th Letter included a copy of the Demand, and

requested confirmation within five days of receipt that the Demand had been received by the Board and that the Board had not issued a response. *See* Exhibit C.

147.     Plaintiff's counsel confirmed that the February 13th Letter was received by a Company agent.

148.     Then, on February 22, 2016, Plaintiff's counsel communicated via telephone with counsel authorized to speak on behalf of the Board.  During the call, Plaintiff's counsel was informed that the Board had, in fact, received the Demand in November 2015, and had intentionally chosen not to investigate it or respond to it.

149.     Pursuant to Texas law, the Board was duty bound upon receipt to investigate the Demand.  As such, the Board's admitted intentional failure to do so cannot be construed as anything but a wrongful refusal.  This, coupled with the fact that Plaintiff received no response whatsoever by the ninety-first day, cannot lead to any conclusion other than that which is readily apparent – that the Demand has been wrongfully refused.

150.     Thus, given the Board's flagrant disregard of Texas law and intentional failure to even investigate the Demand, Plaintiff has been left with no other recourse than filing this Action, which must be allowed to proceed.

**COUNT I**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR**
**DISSEMINATING FALSE AND MISLEADING INFORMATION**

151.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152.     As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Whole Foods disseminated accurate, truthful and complete information to its shareholders.

153.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Whole Foods shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

154.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

155.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

156.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things, ensure that the Company was operated in a lawful manner and to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

157.    Defendants willfully ignored the obvious and pervasive problems with Whole Foods's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

158.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Whole Foods.

161.    Plaintiff, as a shareholder and representative of Whole Foods, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV
## FOR ABUSE OF CONTROL

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Whole Foods, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Whole Foods to misrepresent material facts regarding its business practices, financial position and business prospects.

164.    As a direct and proximate result of Defendants' abuse of control, Whole Foods has sustained significant damages.

165.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

166.    Plaintiff, on behalf of Whole Foods, has no adequate remedy at law.

## COUNT V
## GROSS MISMANAGEMENT

167.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168.    Defendants had a duty to Whole Foods and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Whole Foods.

169.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Whole Foods in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Whole Foods's affairs and in the use and preservation of Whole Foods's assets.

170.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Whole Foods to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Whole Foods, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Whole Foods.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing Whole Foods to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to

protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      C.    Awarding to Whole Foods restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

      D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      E.    Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 18, 2016



**Schneider Wallace Cottrell**
**Konecky Wotkyns, LLP**
Peter Schneider
TX Bar No. 00791615
3700 Buffalo Speedway, Ste 1100
Houston, TX  77098
pschneider@schneiderwallace.com
Phone: (713) 338-2560
Fax: (866) 505- 8036


**Profy Promisloff & Ciarlanto, P.C.**
Jeffrey J. Ciarlanto
PA Bar No. 205838
Joseph M. Profy
PA Bar No. 77141
David M. Promisloff

ciarlanto@prolawpa.com
profy@prolawpa.com
david@prolawpa.com
100 N 22nd Street, Unit 105
Philadelphia, PA 19103
Phone: (215) 259-5156
Fax: (215) 600-2642


Counsel for Plaintiff